No. 20-16908

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,

*Plaintiffs–Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as the President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,

*Defendants–Appellants*.

On Appeal from the United States District Court
for the Northern District of California

## BRIEF FOR PLAINTIFFS-APPELLEES

MICHAEL W. BIEN
ERNEST GALVAN
VAN SWEARINGEN
BENJAMIN BIEN-KAHN
ALEXANDER GOURSE
AMY XU
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

KELIANG (CLAY) ZHU
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, CA 94588

ANGUS F. NI
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, WA 98104

DAVID M. GOSSETT
COURTNEY T. DETHOMAS
DAVIS WRIGHT TREMAINE LLP
1301 K Street, N.W., Suite 500 East
Washington, DC 20005
(202) 973-4200

THOMAS R. BURKE
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6500

JOHN M. BROWNING
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, NY 11201
(212) 489-8230

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee the U.S. WeChat Users Alliance (USWUA) is a New Jersey non-profit grassroots organization that is in the process of being registered under Internal Revenue Code section 501(c)(3).  It was established by a set of U.S. users of the WeChat application to fight President Trump's ban of WeChat. USWUA has no relationship with Tencent Holdings, Ltd., the Chinese corporation that owns and operates the WeChat app, nor any political party or foreign government.  USWUA has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee Chihuo, Inc., is a corporation dually registered in California and Delaware.  It is a media and online retailer that creates promotional content regarding Chinese restaurants and cuisine for people residing in the United States, and operates largely on the WeChat app.  Chihuo, Inc. has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

The remaining Plaintiffs-Appellees are all individuals residing in the U.S.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS ..................................................... ii

TABLE OF AUTHORITIES ................................................. iv

INTRODUCTION ........................................................... 1

STATEMENT OF THE ISSUE ................................................. 3

STATEMENT OF THE CASE .................................................. 4

    A.    The WeChat App ..................................................... 4

    B.    IEEPA And The WeChat Ban ........................................... 6

    C.    Procedural History ................................................. 10

SUMMARY OF THE ARGUMENT ............................................... 13

STANDARD OF REVIEW .................................................... 16

ARGUMENT .............................................................. 17

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
GRANTING THE PRELIMINARY INJUNCTION. ................................. 17

I.    Plaintiffs Are Likely To Succeed On The Merits Of Their First
Amendment Claim. ...................................................... 18

    A.    The WeChat Ban Is Subject To First Amendment Review. .............. 20

        1.    The Government Cannot Justify The WeChat Ban As A
Purely Commercial Regulation Because Its Effect Is To
"Shut Down" A Communications Platform .......................... 21

        2.    The Government Ignores The First Amendment Rights
Of WeChat Users. .............................................. 26

    B.    The WeChat Ban Is Subject To The Most Exacting Standards
Of First Amendment Review And Cannot Possibly Survive ............. 31

1. The WeChat Ban Is An Unconstitutional Prior Restraint.........31

2. The WeChat Ban Is A Content-Based Restriction On Speech And Fails Strict Scrutiny. ...............................37

C. The District Court Did Not Abuse Its Discretion In Holding That The WeChat Ban Likely Would Not Survive Intermediate Scrutiny. ...............................................................41

II. The District Court Correctly Held That The Remaining Equitable Factors Tip Sharply In Plaintiffs' Favor..........................................46

A. The District Court's Assessment Of The Risks To National Security Does Not Constitute Clear Error...........................46

1. The Government's National-Security Evidence Opposing Plaintiffs' Preliminary Injunction Motion Was Not Specific To WeChat. ...............................50

2. Subsequent Evidence Submitted By The Parties Was Properly Balanced By The District Court.................52

3. The Government Is Improperly Attempting To Relitigate Its National-Security Claims Before This Court. ....................55

B. Plaintiffs Would Be Irreparably Harmed By A WeChat Ban.............58

C. There Are No Viable Alternatives To WeChat..................................61

CONCLUSION ............................................................................63

STATEMENT OF RELATED CASES ....................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treas.*,
686 F.3d 965 (9th Cir. 2012) ............................................................24, 44, 45, 47

*All. for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................................................................16, 36

*Arcara v. Cloud Books*,
478 U.S. 697 (1986) ..........................................................................................29

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ..............................................................14, 23, 34

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................................31

*Bay Area Peace Navy v. United States*,
914 F.2d 1224 (9th Cir. 1990) .........................................................................44

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009) .........................................................................39

*Brown v. Entm't Merch. Ass'n*,
564 U.S. 786 (2011) ..........................................................................................39

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) ...........................................................................28

*Carroll v. President & Comm'rs of Princess Anne*,
393 U.S. 175 (1968) ..........................................................................................31

*CBS, Inc. v. Davis*,
510 U.S. 1315 (1994) ...................................................................................35, 49

*Citizens United v. FEC*,
558 U.S. 310 (2010) ..........................................................................................38

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994) ..................................................................... *passim*

*Cohen v. Cowles Media Co.,*
    501 U.S. 664 (1991) ............................................................................. 29

*Def. Distributed v. United States Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ............................................................. 48

*E. Bay Sanctuary Covenant v. Barr,*
    964 F.3d 832 (9th Cir. 2020) ............................................................. 16

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) ........................................................... 17

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................... 30, 40, 41 58, 59

*G.K. Ltd. Travel v. City of Lake Oswego,*
    436 F.3d 1064 (9th Cir. 2006) ........................................................... 46

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) ..................................................................... 32, 34

*Haig v. Agee,*
    453 U.S. 280 (1981) ........................................................................... 49

*Hamdi* v. *Rumsfeld,*
    542 U.S. 507 (2004) ........................................................................... 48

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ......................................................................... 43, 47

*Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ........................................................................... 35

*Lamont v. Postmaster General,*
    381 U.S. 301 (1965) ............................................................... 28, 30, 37

*Lowry v. Barnhart,*
    329 F.3d 1019 (9th Cir. 2003) ........................................................... 55

*Marland v. Trump*,
No. CV 20-4597, 2020 WL 6381397 (E.D. Pa. Oct. 30, 2020),
*appeal docketed*, 20-3332 (3d Cir. Nov. 12, 2020) ..................................8, 25, 50

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983)...........................................................................24

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971)...............................................................31, 33, 48, 49

*Near v. Minnesota*,
283 U.S. 697 (1931)...............................................................13, 19, 32, 49

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976)...........................................................................31

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................17, 43, 44

*Packingham* v. *North Carolina*,
137 S.Ct. 1730 (2017).....................................................................1, 44

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...................................................................37, 38

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)...............................................................14, 33, 36

*Stanley v. Georgia*,
394 U.S. 557 (1969).........................................................................28

*Thomas v. Chicago Park District*,
534 U.S. 316 (2002).........................................................................36

*TikTok Inc. v. Trump*,
2020 WL 5763634 (D.D.C. Sept. 27, 2020),
*appeal docketed*, 20-05302 (D.C. Cir. Oct. 8, 2020)...............................8, 25, 60

*Trump v. Int'l Refugee Assistance Project*,
137 S.Ct. 2080 (2017).....................................................................47

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994).........................................................................23

*United States* v. *N.Y. Times Co.*,
    328 F. Supp. 324 (S.D.N.Y.), *aff'd*, 403 U.S. 713 (1971) .................................48

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ..........................................................................................29

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ..........................................................................16

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ..........................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................16

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020) ..........................................................................28

*Ziglar v. Abbasi*,
    137 S.Ct. 1843 (2017) ..................................................................................15, 47

**Constitutional Provisions**

U.S. Const. amend. I .....................................................................................*passim*

**Federal Statutes**

International Emergency Economic Powers Act, Pub. L. No. 95-223,
    91 Stat. 1625 (1977), 50 U.S.C. § 1701 *et seq.* ...........................................*passim*

    50 U.S.C. § 1701(b) ...........................................................................................6

    50 U.S.C. § 1702(a) ........................................................................................6, 7

    50 U.S.C. § 1702(b) ........................................................................................6, 7

National Emergencies Act, Pub. L. No. 94-412,
    90 Stat. 1255 (1976), 50 U.S.C. § 1601 *et seq.* .............................................6, 7

**Regulations**

Exec. Order 13873, "Securing the Information and Communications
    Technology and Services Supply Chain,"
    84 Fed. Reg. 22,689 (May 17, 2019) ...................................................................7

Exec. Order 13942, 85 Fed. Reg. 48,637 (Aug. 11, 2020) .....................................7, 8

Exec. Order 13943, 85 Fed. Reg. 48,641 (Aug. 11, 2020) ................................2, 7

**Other Authorities**

Ana Swanson & David McCabe, *Trump to Ban TikTok and WeChat from U.S. App. Stores*, N.Y. TIMES (Sept. 18, 2020) ...........................................8

Cong. Research Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (July 14, 2020) ...............................................................................................................6

Danny Lewis, *How Banning WeChat Could Harm New York City's Chinese Restaurants*, WNYC NEWS (Oct. 28, 2020).......................60

Noah Kim, *How Andrew Yang Quieted the Asian American Right*, ATLANTIC (Feb. 3, 2020) ....................................................................59

Francesco Liang, *Pope Francis's Mass from the Casa Santa Marta followed even in China*, VATICAN NEWS (May 20, 2020)................................60

Xiaojun Yan & Jie Huang, *Navigating Unknown Waters: The Chinese Communist Party's New Presence in the Private Sector*, 17(2) CHINA REV. (2017) ....................................................................58

# INTRODUCTION

President Trump's unprecedented ban of WeChat—shutting down an entire "super App" that functions as the primary means for the Chinese diaspora to communicate and conduct business—runs roughshod over the First Amendment. As the Supreme Court recently explained, "cyberspace" and "social media" today are "the most important places … for the exchange of views." *Packingham* v. *North Carolina*, 137 S.Ct. 1730, 1735 (2017). Rather than continuing the great American tradition of fighting repression abroad by modelling how a free and open society operates, the government seeks to kill off this digital town square—in the midst of a pandemic. The district court appropriately blocked that effort while this case is litigated.

Paying bare lip service to this Court's limited review—the decision to grant a preliminary injunction is reviewed for abuse of discretion, with factual determinations reviewed for clear error—the government repeatedly invokes national security to justify the ban. But that is not an all-powerful talisman. The government ignores the fact that the district court *accepted* the government's stated security concerns, I-ER-16, 84, yet still concluded that "the government's prohibited transactions are not narrowly tailored to address the government's significant interest in national security." I-ER-16. Under the First Amendment, that lack of tailoring is fatal.

1

The most extreme example of the government's failure to grapple with the applicable standard of review is its response to the district court's conclusion as a factual matter that the WeChat Executive Order, II-ER-262, as implemented by Secretary Ross's *Identification of Prohibited Transactions*, II-ER-224 (together, the "WeChat ban"), "will … shut down WeChat." I-ER-82. The government simply ignores that this determination was based in part on Secretary Ross's own statements on national television the day he released the *Identification*: "For all practical purposes, [WeChat] will be shut down in the U.S." *Id.* Indeed, the government does not even attempt to defend such a ban as consistent with the First Amendment, instead recasting the ban as applying to "business-to-business" transactions only, and thus purportedly exempt from First Amendment review. Br. 25. But WeChat is not simply a business application that can be regulated without regard to the First Amendment; it is a medium of communication.

Even if the government were correct that its actions will merely degrade the app's performance until it falls into such disrepair that users are forced to abandon it, that would be, if anything, harder to justify under the First Amendment. To the extent WeChat poses an immediate and significant threat to the nation's security, as the government contends, a ban that takes two years to go into effect is not tailored to that risk. In contrast, various other possible actions the government could take—as proposed by Tencent in its mitigation proposals, recommended by

the government's *own* agencies, and suggested by Plaintiffs' experts—would address the government's national-security concerns right away while also respecting Plaintiffs' First Amendment rights.

Finally, even if there were any question on the merits, the balance of equities justifies the preliminary injunction. The government pays little heed to the effect of its ban on Plaintiffs and the other 19 million WeChat users in the United States, who use the app to "communicate, socialize, [] engage in business, charitable, religious, medical-related, and political activities with family, friends, and colleagues." I-ER-70. Any ban on the app would prevent millions of Americans from exercising core rights protected by the First Amendment, as "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese-American community." I-ER-83. The government fails even to acknowledge that this factual determination is subject only to clear-error review, attempting to relitigate the question of adequate alternatives anew. The district court's preliminary injunction was appropriate.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in issuing a preliminary injunction, based on its reasonable determinations that the WeChat ban violates the First Amendment; the connection between that ban and the government's national-

security interests is "modest," I-ER-86; and the injury to Plaintiffs absent an injunction would be irreparable.

## STATEMENT OF THE CASE

### A.    The WeChat App

WeChat is a mobile application developed by Tencent Holdings Ltd., a Chinese company, which has 19 million regular users in the United States and more than 1.2 billion users worldwide.  I-ER-70.  WeChat users rely on the app for a host of functions, including text messaging, placing video calls, engaging on social media, reading and publishing news stories, ordering products and services, interacting with state and local governments in the United States about issues of public importance, and much more.  *Id.*  In other words, the app acts as a substitute for a dozen or more apps that might appear on the average American smartphone. Because WeChat serves so many purposes, it has become known as a "super app" and has become deeply integrated into many of its users' daily lives.  II-ER-438, 482-483; I-SER-004, 10.

Many users in the United States—including Plaintiffs—are Chinese emigrants or otherwise connected to the Chinese diaspora.  As the district court found, these WeChat users "rely on WeChat … as their 'primary source of communication and commerce.'"  I-ER-70.

4

For some, it is their main way to communicate with family members, relatives, and friends in China and the United States. See *id.*; I-ER-83, II-ER-478, 488-489, 495, 499, 505. Indeed, it is the exclusive means of communication for many who do not speak English. WeChat users also use the app to exercise their religion, run their businesses, manage their non-profit organizations, read, share and comment on the news, organize political causes, contribute to charities, and maintain social bonds. *E.g.*, II-ER-478-479, 495, 499-500, 505. One Plaintiff, for example, uses WeChat to operate a nonprofit organization that helps provide mental-health services within the "underserved Chinese community" in California. II-ER-499-500. Another uses the app to fundraise for disadvantaged high school students in her hometown in China. II-ER-505-506. Yet another uses WeChat to facilitate Bible studies and religious discussion. II-ER-478-479. Many users also join discussion groups to cultivate business, professional, political, and personal networks. WeChat has also played a critical role during the pandemic, providing a lifeline to elderly relatives unable to visit family and helping officials communicate public health information. II-ER-438-439, 446, 451-452, 500.

In short, because of WeChat's functionality, ease of use for non-English speakers, established network of Chinese and Chinese-American users—and the fact that other social media apps are banned in China—WeChat is often the only

platform on which Plaintiffs and other WeChat users exercise the core freedoms of speech, religion, and political activity protected by the First Amendment.

### B. IEEPA And The WeChat Ban

1. Historically, Congress ceded broad emergency authority to the President to address crises both domestic and foreign. *See* Cong. Research Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 5-6 (July 14, 2020), https://bit.ly/3jC1az2. After Vietnam and Watergate, however, Congress circumscribed the President's authority to declare national emergencies and act under emergency powers through the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), 50 U.S.C. § 1601 *et seq.*, and the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625 (1977), 50 U.S.C. § 1701 *et seq*.

IEEPA permits the President to regulate or prohibit certain transactions if the President has declared a related national emergency arising from an "unusual and extraordinary threat" to the United States. 50 U.S.C. § 1702(a)(1)(B), (b). The President may only exercise IEEPA authority "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared," "not … for any other purpose." *Id.* § 1701(b). And IEEPA absolutely bars the President from touching certain transactions under the guise of his IEEPA authority. The President may not use IEEPA, for example, "to regulate or prohibit,

6

directly or indirectly … (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." *Id.* § 1702(b)(1). Other activities excluded from the President's IEEPA authority include donations for humanitarian purposes, importation of informational materials, and transactions related to international travel. See *id.* § 1702(b)(2)-(4).

2. In May 2019, President Trump issued Executive Order 13873, "Securing the Information and Communications Technology and Services Supply Chain" (ICT Order), 84 Fed. Reg. 22,689 (May 17, 2019). II-ER-393. Relying on IEEPA and the NEA, the ICT Order declared a national emergency relating to unidentified vulnerabilities in "information and communications technology or services" from unidentified "foreign adversaries."

Over a year later, the President relied on this emergency declaration to issue Executive Order 13943 (WeChat Order), 85 Fed. Reg. 48,641 (Aug. 11, 2020). II-ER-262. The WeChat Order states that "the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China (China) continues to threaten the national security, foreign policy, and economy of the United States." *Id.* It identifies WeChat as such a threat because "WeChat automatically captures vast swaths of information from its users," which "threatens to allow the Chinese Communist Party access to Americans' personal and

proprietary information." *Id.*[1]  The WeChat Order prohibited "any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States" to the extent that such a transaction is "identified by the Secretary of Commerce."  II-ER-262-263.  The WeChat order then directed the Secretary to "identify the transactions subject to" the prohibition within 45 days, by September 20, 2020.  II-ER-263.

     3.    On September 18, 2020—two days before the WeChat Order was by its terms to take effect—the Secretary issued the *Identification*, II-ER-224, which clarified the scope of the WeChat Order.  These seven prohibitions bar U.S. app stores from allowing WeChat downloads or updates; make it illegal to provide internet hosting services, "content delivery services," or "internet transit or peering services" for WeChat's "functioning or optimization"; and foreclose using WeChat to make payments.  II-ER-228-229.  The transactions targeted by the WeChat ban are critical to the app's functioning.  "[F]or all practical purposes," according to the Secretary, these prohibitions would work together to "shut down" WeChat "in the U.S." as of the effective date of his order.  I-ER-68 (citing Ana Swanson & David

---

[1] At the same time, the President issued a similar executive order targeting another app, TikTok. *See* Exec. Order 13942, 85 Fed. Reg. 48,637 (Aug. 11, 2020). ER265.  Two district courts have preliminarily enjoined the TikTok ban.  *See TikTok Inc. v. Trump*, 2020 WL 5763634, at *9 (D.D.C. Sept. 27, 2020), *appeal docketed*, 20-05302 (D.C. Cir.); *Marland v. Trump*, No. CV 20-4597, 2020 WL 6381397 (E.D. Pa. Oct. 30, 2020), *appeal docketed*, 20-3332 (3d Cir.).

McCabe, *Trump to Ban TikTok and WeChat from U.S. App. Stores*, N.Y. TIMES (Sept. 18, 2020)) *see also* II-ER-411.

In support of their motion for a stay of the preliminary injunction in the district court, the government provided a partial administrative record, including a Decision Memorandum from the Deputy Assistant Secretary of Intelligence and Security to Secretary Ross and certain of its attachments. *See* II-ER-232-257. The memo grounds the WeChat ban in the following assertions, each of which the memo calls a "threat:" (1) China is a national security, foreign policy and economic adversary, II-ER-232; (2) the Chinese Communist Party ("CCP") influences private enterprises like Tencent, II-ER-237; (3) Chinese law requires private enterprises like Tencent to cooperate with government intelligence and surveillance efforts, II-ER-238; and, (4) Tencent allegedly has complied with China's monitoring, surveillance and censorship efforts, II-ER-239. But the memo offers no evidence that the Chinese government has used WeChat to surveil Americans, sought Tencent's assistance with law-enforcement efforts directed at U.S. users, or otherwise threatened the United States' national security.

In addition, the memo explains that Tencent submitted a mitigation proposal meant to address the government's national-security concerns. *See* II-ER-244 (describing the proposal); III-ER-562 (the proposal, which is governed by a protective order). Among other things, Tencent proposed to develop an entirely

new version of the app for use in the United States, implement security measures specific to the new app, store data with a United States provider, allow for regular, independent code-audits, and install a United-States-based app manager. II-ER-244. The government rejected Tencent's proposal out of hand because it asserted it lacked a "baseline of trust" with Tencent, and adopted the position that "[t]here is no way to create such a baseline of trust that would allow for effective mitigation without a complete divestiture from Tencent ownership." *Id.*

The purported threats identified in the memo were not new; they have been known for years. Moreover, the memo does not highlight any significant events in the intervening year between the ICT Order and the WeChat ban that would have prompted the need to ban WeChat in particular. Instead, the memo relies on vague and hypothetical language suggesting "the *possibility*" that the Chinese government "*could* … compel Tencent to provide systemic access to U.S. users' sensitive personal information," or that Chinese "intelligence operations *could ostensibly* occur without Tencent's express knowledge or awareness." II-ER-242 (emphases added).

### C.    Procedural History

1.    Plaintiffs filed this action shortly after the President issued the WeChat Order, and moved for a preliminary injunction. After the Secretary clarified the scope of the WeChat ban, Plaintiffs amended their complaint, *see* II-

ER-437, and renewed the preliminary injunction motion. The district court granted the preliminary injunction on September 20, 2020—the day the WeChat ban was to go into effect.

After carefully reviewing the record, the district court determined that the "the prohibited transactions will result in shutting down WeChat," finding that "the government does not meaningfully contest through evidence that the effect of the prohibited transactions will be to shut down WeChat (perhaps because the Secretary conceded the point)." I-ER-82. The court further found that "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese-American community"; "WeChat is effectively the only means of communication for many in the community." I-ER-83. While the government sought to justify the ban "based on national-security concerns," the court explained the ban could survive neither the strict scrutiny that attends a prior restraint on speech nor the intermediate scrutiny that attends a content-neutral restriction on speech. I-ER-77-78, 82-83. The court acknowledged that the government has a "significant" interest in national security in light of "China's activities"; but it concluded that the record contained "scant little evidence that its effective ban of WeChat for all U.S. users addresses those concerns." I-ER-84. Thus, the district court concluded that Plaintiffs "have shown serious questions" under the First Amendment and otherwise met the factors warranting injunctive relief. I-ER-82, 86-87.

2.     After the district court granted the preliminary injunction, the government appealed that injunction to this Court; and moved to stay the injunction pending appeal both in the district court and in this Court.

The district court denied the government's stay motion. I-ER-1 (redacted version); III-ER-527 (unredacted version). Despite the government's effort to bolster its national-security claims through the memorandum described above, a new declaration from the Assistant Secretary, and a significant number of new exhibits, the district court found that "the government's new evidence does not meaningfully alter its earlier submissions. The court's assessment of the First Amendment analysis and the risks to national security—on this record—are unchanged." I-ER-16. The district court concluded that "the record does not support the conclusion that the government has 'narrowly tailored' the prohibited transactions to protect its national-security interest." I-ER-17. To the contrary, Judge Beeler concluded, the WeChat ban "'burdens substantially more speech than is necessary to further the government's significant interest.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

This Court likewise denied a stay. In a brief order, Judges Fletcher, Berzon, and Bybee unanimously concluded that the "record before" them had "not demonstrate[d] that [the government] will suffer an imminent, irreparable injury

during the pendency of this appeal." Dkt. 106, at 1. The government did not seek a stay from the Supreme Court.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in enjoining the WeChat ban while this case is litigated. The government's arguments to the contrary cannot withstand scrutiny.

I.A. The government adopts the extraordinary position that it can single out, cripple, and ultimately silence WeChat—an app on which millions rely for personal, professional, religious, and civic speech—without encountering *any* First Amendment scrutiny. Br. 9, 25-31. But this is precisely the type of prior restraint that the First Amendment was designed to prevent. *See Near v. Minnesota*, 283 U.S. 697, 713 (1931). There is no support for the government's asserted unlimited power to regulate an expressive medium as long as the regulations target "commercial transactions," even if the regulations *directly result* in the curtailment of protected speech. *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). And the government largely ignores the substantial burden it places on the core First Amendment rights of WeChat users in the United States. Thus, the district court correctly saw through the government's argument, holding that "plaintiffs have shown serious questions going to the merits of their First Amendment claim that the [WeChat ban] effectively eliminate[s] the plaintiffs' key platform for

13

communication, slow[s] or eliminate[s] discourse, and [is] the equivalent of censorship of speech or a prior restraint on it." I-ER-82.

B.   The WeChat ban is subject to the highest levels of First Amendment review, which it cannot survive. The WeChat ban fits comfortably within the definition of a prior restraint: It is an "official action" that has a "censoring effect" on speech before it is communicated, very much like a prohibition on the publication of a book or the targeted shuttering of a newspaper. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). The government argues that the WeChat ban is directed at "business-to-business" transactions, and has only an "incidental" effect on speech. Br. 21, 30. But the government acknowledges that the express purpose of the regulation is to "make the application less effective over time for current users," Br. 18—to "shut down" the app—in a concerted effort to single out and eliminate a disfavored medium of expression. I-ER-68; II-ER-404-405; *Ladue*, 512 U.S. at 48. The government may not indirectly kill WeChat by "cutting off [its] oxygen" without triggering First Amendment protections. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).

Moreover, the WeChat ban is not content neutral, and thus is subject to—and fails—strict scrutiny review. The WeChat ban discriminates against the Chinese-American community by depriving them of a vital network, and the burdens on speech it causes are not "incidental" but rather are significant,

14

pernicious, and a direct result of the government's express targeting of a medium of communication favored by the Chinese diaspora—possibly because of racial bias. And the ban fails to address the problem that the government purports to solve—preventing the Chinese government from collecting U.S. user data—while multiple alternatives would have done so with less effect on protected speech.

C. Nor can the WeChat ban survive intermediate scrutiny. After reviewing the government's numerous evidentiary submissions, the district court *acknowledged* the government's "significant" national-security concerns, but determined that "the government's prohibited transactions are not narrowly tailored to address" them. I-ER-16, 84. It is not this Court's role to second-guess the district court's judgment based on a reasonable interpretation of the record, even where national security is invoked. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1861 (2017).

II. The district court correctly held that the remaining equitable factors tip sharply in the WeChat users' favor. The government argues that the district court inappropriately discounted the national-security risks that led to the WeChat ban. *E.g.*, Br. 48-49. But the district court paid appropriate deference to the government's claim that China is "a persistent cyber espionage threat." I-ER-84; Br. 11. It just concluded that the record contained "scant little evidence" that the ban "addresses those concerns." I-ER-84. Indeed, the government was never able

to identify any particular threat stemming from WeChat itself. Mere speculation that the WeChat ban "could" protect the national security is not enough to overcome the serious First Amendment implications of the ban, or the irreparable harm Plaintiffs would suffer from the elimination of their primary platform for communication. I-ER-86.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 843 (9th Cir. 2020). While legal conclusions are reviewed de novo, "factual findings are entitled to deference unless they are clearly erroneous." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

To secure a preliminary injunction, a movant must demonstrate (1) likelihood of success on the merits, (2) likelihood of irreparable harm if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a sliding-scale approach to preliminary injunctions; "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

The factors governing preliminary injunctions "substantial[ly] overlap" with the standard applied to a motion to stay, *Nken v. Holder*, 556 U.S. 418, 434 (2009), and the decision by a motions panel to deny a stay of a preliminary injunction is "persuasive, but not binding" on the merits panel considering an appeal of that injunction. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1264-65 (9th Cir. 2020).

## ARGUMENT

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING THE PRELIMINARY INJUNCTION.

The government argues that the district court erred in granting the preliminary injunction because it "misapprehended" the ban and "failed to adequately grasp" the government's national-security arguments. Br. 47. But the government has limited scope to relitigate these issues on appeal given the standard of review.

The government subverts the abuse-of-discretion standard by ignoring the factual findings underpinning the preliminary injunction—ignoring, for example, the district court's reliance on the declarations of two technical experts, Adam Roach and Joe Hildebrand, II-ER-406-412, 424-429, which showed that the WeChat ban would shut down a unique communications platform without actually resolving the national-security problem. And the government presents a view of

17

the law that is not only unsupportable but dangerous—remarkably, arguing against *any* First Amendment review at all.

When the facts that the government seeks to ignore are considered and governing law is recognized, it is clear that the district court did not abuse its discretion.

## I. Plaintiffs Are Likely To Succeed On The Merits Of Their First Amendment Claim.

The government barely acknowledges the district court's central holding: "On this record, the plaintiffs have shown serious questions going to the merits of their First Amendment claim that the Secretary's prohibited transactions effectively eliminate the plaintiffs' key platform for communication, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it." I-ER-82. The government does not even accept that this is a holding, dismissing it as merely "plaintiffs' claim." Br. 19. But in reality, the district court *held*—based on its review of the evidence—that Plaintiffs are likely to establish that the WeChat ban is an unconstitutional prior restraint.

Rather than confront this holding, the government pivots to the unprecedented and indefensible position that it can "eliminate" a digital communications platform upon which millions of Chinese speakers rely without encountering *any* First Amendment scrutiny. This argument rests on two irreconcilable predicates. The government contends that the WeChat ban does not

implicate the First Amendment *at all* because it is a neutral regulation of "business-to-business transactions" between Tencent and companies on which Tencent relies to make WeChat function. Br. 24-30. But the government also acknowledges that the avowed purpose of the WeChat ban is to "shut down" this key communications platform by making it unusable. I-ER-224.

The Court should look past this ruse to see the obvious truth: As the district court found, the government seeks to single-out, cripple and ultimately destroy a medium of communication for which "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese American community." I-ER-83. The government's regulations will indisputably prevent millions of people from communicating via WeChat, even though (as the district court found) "WeChat is effectively the only means of communication for many in the community, not only because China bans other apps, but also because Chinese speakers with limited English proficiency have no other options than WeChat." *Id*. The government wants to exempt this regulation from *any* First Amendment scrutiny, but it is precisely the type of prior restraint that the First Amendment was designed to prevent. *See Near*, 283 U.S. at 713 ("[I]t has been generally, if not universally, considered that it is the chief purpose of the [First Amendment] to prevent previous restraints upon publication."). *See also* Section I. B.1 *infra*.

As a prior restraint, the WeChat ban is subject to a heightened strict scrutiny standard that the government cannot possibly satisfy—and indeed, does not even attempt to meet. The government could not even satisfy intermediate scrutiny—as the court below held.

## A. The WeChat Ban Is Subject To First Amendment Review.

The government argues against First Amendment review of the WeChat ban because the "prohibited transactions do not restrict any speech at all; plaintiffs remain free to say whatever they like." Br. 2. According to the government, the First Amendment would only apply to an explicit and immediate prohibition against using WeChat to communicate. But there is no support for the government's asserted unlimited power to regulate an expressive medium as long as the regulations target "commercial transactions," even if the regulations *directly result* in the curtailment of protected speech. And the government's suggestion that the First Amendment provides WeChat users with no protection against the purportedly "limited incidental effects" of its regulations, despite the avowed purpose of destroying their communications platform of choice, is not remotely consistent with the law. This Court should reject both of these premises, which would allow the government to bypass the First Amendment at will.

20

### 1. The Government Cannot Justify The WeChat Ban As A Purely Commercial Regulation Because Its Effect Is To "Shut Down" A Communications Platform.

The government cannot credibly argue that it is merely regulating "a set of business-to-business transactions," Br. 30, when the express purpose of the WeChat ban is to shut down a digital platform whose predominant function is to facilitate a wide range of communications between members of the Chinese diaspora. Even the government concedes, as it must, that "regulation of commerce or conduct may be subject to First Amendment scrutiny when the regulated conduct itself contains a significant expressive element … or has the inevitable effect of singling out those engaged in expressive activity." Br. 30.

It is beyond dispute that the prohibitions will have the inevitable effect of singling out and foreclosing the speech of WeChat users in the United States, even though the government frames the regulation in terms of commercial transactions that allow WeChat to function. Indeed, it is impossible to conceive of the WeChat ban as anything other than a concerted effort to target and destroy a disfavored medium of expression. The WeChat Order identifies the app as "a messaging, social media, and electronic payment application," and prohibits "any transaction that is related to WeChat by any person"—a prohibition (with criminal penalties) so broad that it plausibly prohibits individual communications exchanged over the application. II-ER-262-264. The Commerce Department purported to limit the

scope of the regulations to commercial and technological transactions that underpin WeChat, but Secretary Ross left no doubt as to the purpose of the WeChat ban: "For all practical purposes [WeChat] will be shut down in the U.S. … as of midnight Monday [September 21, 2020]." I- ER-68. Plaintiff's expert agreed: WeChat will "effectively be shut down as soon as [the ban] is fully implemented." II-ER-411.

Defendants now seek to distance themselves from the Secretary's statement by asserting that there will be a grace period in which WeChat will still be useable in the United States. Br. 18. But they do not disavow that the purpose of the Identification is to prevent WeChat from functioning in the U.S. Br. 18; II-ER-245. Indeed, the government's *own* declarant leaves no room for doubt: "the purpose of the prohibitions is to degrade, impair, and (as pertains to financial transactions) prohibit the WeChat services … with the goal of encouraging and eventually requiring U.S.-based WeChat users to transition to alternative platforms.… [I]t is my best estimation that it would take 1-2 years for the WeChat app to be impaired to the extent it would no longer function." II-ER-404-405. But whatever the timeframe, the stated purpose of the WeChat ban is to regulate a communications platform out of existence.

It should be self-evident that the First Amendment applies to a regulation that aims to make it impossible for millions of Chinese-speaking people to

communicate through their preferred medium, but the government makes several attempts to argue that the WeChat ban should be exempt. First, the government asserts that the WeChat ban "prohibit[s] a variety of commercial transactions related to WeChat," as opposed to explicitly banning communications on the platform. This is a distinction without a difference. Heightened scrutiny is required for any regulation that constricts a medium of expression, regardless of whether the regulations are framed in terms of economics or speech, "because regulation of a medium inevitably affects communication itself." *Ladue*, 512 U.S. at 48. As the Seventh Circuit vividly put it in enjoining the government's effort to shut down another digital platform by pressuring credit card companies not to facilitate payments through the site, "[t]he analogy is to killing a person by cutting off his oxygen supply rather than by shooting him." *Backpage.com*, 807 F.3d at 231; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) ("Because the must-carry provisions impose special obligations upon cable operators and special burdens upon cable programmers, some measure of heightened First Amendment scrutiny is demanded."). The method of execution chosen by the government does not matter—First Amendment protection is triggered any time the purpose or inevitable effect of governmental action is to restrict protected speech.

The government also suggests "it cannot be that the First Amendment protects an app that threatens national security because the app happens to provide

users with communicative functionality." Br. 30. But this is backwards: The government must *satisfy* the First Amendment precisely because the WeChat ban singles out a platform that "happens to provide users with communicative functionality." In other words, the government's national-security concerns are not dispositive in favor of the government, but merely part of the necessary First Amendment balancing. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treas.*, 686 F.3d 965, 995-1001 (9th Cir. 2012) (balancing national-security interests). Despite its best efforts at hair splitting, the government cannot pretend that it can regulate the commercial features of WeChat while leaving user communications undisturbed.

If the government's position were correct and it had virtually unchecked power to "shut down" speech with economic sanctions, there would be nothing to prevent taxes being levied specifically against newspapers; nothing to prevent the government putting Facebook and Google out of business by prohibiting anyone from providing internet hosting services to those websites; and nothing to prevent the abolition of low-cost cell phones by gradually requiring higher rates until they became unaffordable. Clearly, none of these outcomes could possibly avoid First Amendment scrutiny—nor can the WeChat ban. *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("Differential taxation of the press … places such a burden on the interests protected by the First

Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation.").

Two recent decisions enjoining the government's parallel effort to ban another communications platform owned by a Chinese entity, TikTok, illustrate the flaw in the government's argument that it has carte blanche to regulate speech under the guise of regulating commercial transactions. In each of those cases—one filed by TikTok's parent company, the other by TikTok users—the courts held that an effectively identical ban of TikTok exceeded the President's powers under IEEPA, which specifically does not permit the President "to regulate or prohibit, directly or indirectly either (a) the importation or exportation of information or information materials; or (b) personal communications, which do not involve a transfer of anything of value." *TikTok Inc.*, 2020 WL 5763634, at *4. As Judge Nichols held, "[t]he … Secretary's prohibitions will have the intended effect of stopping U.S. users from communicating (and thus sharing data) on TikTok." *Id.* at *7. *See also Marland*, 2020 WL 6381397, at *12.[2]

---

[2] Plaintiffs here raised an identical IEEPA challenge to the WeChat ban, although the district court did not rule on it. I-ER-85. Were this Court to disagree with the district court's analysis of Plaintiffs' First Amendment claims, the Court should remand without vacating the injunction so the district court could address whether to grant an injunction on IEEPA grounds.

Here too, the WeChat ban regulates personal communications and the exchange of information, notwithstanding the government's argument that the ban focuses on commercial transactions. For this reason—as the district court correctly recognized—First Amendment scrutiny must apply.

### 2. The Government Ignores The First Amendment Rights Of WeChat Users.

The government's argument that the WeChat ban is purely economic also disregards the substantial burden it places on the core First Amendment rights of WeChat users in the United States. Plaintiffs rely on the platform to participate in the virtual community of the Chinese diaspora, and to communicate with individuals located in China who may be blocked from using other apps. I-ER-83.

WeChat enables Plaintiffs to engage in a wide range of First Amendment protected activities, including religious worship and fellowship, participation in social movements and organizations, political campaigns, communicating with— and about—the government, employment, and accessing Chinese language news and information unavailable from other sources. *See* Section II.B, *infra*. The WeChat ban would indisputably block new users from these conversations, and would cause the communications platform that sustains this community to cease to function entirely. II-ER-404-405; 411.

While the government claims that "the restrictions do not 'single out' individuals who may be engaged in expression," Br. 31, the inevitable effect of

26

regulations designed to degrade or shut down a social media app is to burden the speech of the app's users. In this case, those users are predominantly Chinese Americans and members of the Chinese diaspora in the United States who are uniquely dependent on WeChat to communicate. As Judge Beeler found, after thoroughly reviewing the record, "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese American community.... [T]he plaintiffs' evidence reflects that WeChat is effectively the only means of communications for many in the community, not only because China bans other apps, but also because Chinese speakers with limited English proficiency have no options other than WeChat." I-ER-83. The WeChat ban thus targets an essential communications network for Chinese Americans with surgical precision. Plaintiffs do not need to establish racial or xenophobic animus to prevail on their First Amendment claim, but the WeChat ban is consistent with "a surge of racism against Asian Americans … that has been repeated in American history" and is evident from the President's own public statements, such as his insistence on using the terms "plague from China" or "kung flu." I-SER-024. The fact that there plausibly is a racist motive behind the WeChat ban—designed to obstruct the disfavored speech of Chinese Americans—underscores the importance of applying the First Amendment to protect their rights.

Regardless of motivation, the First Amendment indisputably protects the rights that are imperiled by the WeChat ban. Thus, users of an online forum to disseminate speech have standing to challenge a law that caused that forum to shut down. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020). And in addition to protecting the right to speak, it is "well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965) (First Amendment prohibited law regulating delivery of "communist political propaganda" via U.S. mail).[3] By degrading and ultimately destroying the functionality of WeChat, the WeChat ban abrogates WeChat users' basic First Amendment rights to communicate with one another. Accordingly, the regulations must be subjected to First Amendment review.

The government nevertheless argues that that the First Amendment does not apply because the burdens on speech caused by the WeChat ban are "incidental" to the regulation's purpose. The first problem with this argument is that it assumes that the WeChat ban constitutes the "application of general national-security laws."

---

[3] The government's contention that the First Amendment does not protect communications between Americans and foreign citizens, Br. 33, is untenable. The Ninth Circuit has "reject[ed] the suggestion that the First Amendment's protection is lessened when the expression is directed abroad." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 511 (9th Cir. 1988). And the Supreme Court has held that the First Amendment protects the right to *receive* information from abroad. *See Lamont*, 381 U.S. at 308 (Brennan, J., concurring).

Br. 29. In reality, the regulations at issue here were promulgated expressly to single out and destroy the medium of communication favored by the Chinese diaspora. For this reason, the WeChat ban is quite unlike the cases relied upon by the Government, where the Supreme Court reached the unremarkable conclusion that the First Amendment does not preclude the application of existing laws of general applicability against individuals who broke the law. *See, e.g.*, *Arcara v. Cloud Books*, 478 U.S. 697, 707 (1986) (upholding the constitutionality of applying public-health nuisance law to close "an establishment used for prostitution" that also happened to sell adult books); *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (holding that First Amendment was no defense to trespassing charges); *Cohen v. Cowles Media Co.*, 501 U.S. 664, 672 (1991) (applying contract principles to transaction between journalist and source).

The second problem with the government's "incidental harm" argument is that it assumes that the First Amendment does not apply to anything less than a total prohibition on communicating via WeChat. For instance, the government suggests that First Amendment scrutiny is unnecessary because "the prohibitions would not result in the app becoming *immediately* unusable." Br. 17 (emphasis added); *id.* at 29-30. But even if the government was not questioning the district court's reasonable determination of a contested issue of fact subject to clear-error review, the Constitution's prohibition on laws "abridging the freedom of speech"

does not require an immediate, blanket prohibition. Indeed, the Supreme Court struck down a postal regulation requiring recipients of political propaganda from China to "request in writing that it be delivered," even though the recipient might ultimately receive the desired content. *Lamont*, 381 U.S. at 402. *See, e.g*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

It is undisputed that Plaintiffs and other WeChat users will be unable to communicate with users who have not already downloaded the application; will see their service degrade due to lack of updates; may themselves be dissuaded from using WeChat due to a chilling effect caused by the ban; and will eventually be unable to use WeChat when the app shuts down because of the ban. Each of these is a serious First Amendment harm. And the (contested) fact that there may be other apps to which WeChat users could in theory migrate to replace some of WeChat's functionality does not eliminate that harm. Not only did Judge Beeler reasonably conclude based on her review of the evidence that "WeChat is irreplaceable for its users in the U.S., particularly in the Chinese-speaking and Chinese-American community," I-ER-71, but even if users could cobble together ways to replace portions of WeChat's functionality, the government's actions will plainly diminish their ability to communicate.

30

**B.    The WeChat Ban Is Subject To The Most Exacting Standards Of First Amendment Review And Cannot Possibly Survive.**

The WeChat ban is unconstitutional both as a prior restraint, and under the strict scrutiny analysis necessary because the WeChat ban is a content-based regulation of speech—not, as the government contends, "content neutral."  Br. 32.

**1.    The WeChat Ban Is An Unconstitutional Prior Restraint.**

The WeChat ban is a prior restraint because the stated purpose of the regulation is to "shut down" WeChat—which will necessarily deprive Plaintiffs and other users in the United States of the ability to communicate through a unique and vital medium of expression.  A prior restraint is the "most serious and the least tolerable infringement upon First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  "Prior restraint on speech suppresses the precise freedom which the First Amendment sought to protect against abridgement."  *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180 (1968).  Every request for a prior restraint thus comes to a court with "a heavy presumption against its constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also N.Y. Times Co. v. United States (Pentagon Papers)*, 403 U.S. 713, 714 (1971) (per curiam) (same).

The government devotes a mere paragraph of its brief to prior-restraint law, essentially arguing that the WeChat ban is not like earlier prior restraints that explicitly prohibited speech.  Br. 34-35.  But the framers of the First Amendment

31

would instantly recognize the WeChat ban as precisely the type of prior restraint they sought to prohibit. The First Amendment is "a renunciation of the censorship of the press," and specifically a repudiation of licensing regimes in England that gave the government the final say on whether a book could be published. *Near*, 283 U.S. at 713-14. Accordingly, the "main purpose" of the First Amendment "is to prevent all such *previous restraints* upon publications as had been practiced by other governments." *Id*. at 714; *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 244-45 (1936). The framers would have had no problem labelling the WeChat ban an unconstitutional prior restraint because the regulation preempts speech by shutting down a communications platform catering to the Chinese-speaking community—no different from censoring a Chinese language newspaper or banning a foreign-language broadcaster such as Telemundo or Al Jazeera.

The fact that the WeChat ban is, as Professor Chemerinsky put it, "unprecedented in the modern history of this country," does not make it any less of a prior restraint. I-SER-003. Indeed, the Supreme Court's most famous prior restraint decision—which ultimately held that the government could not stop publication of the "Pentagon Papers"—involved unprecedented actions. As Justice Black noted, that case marked "the first time in the 182 years since the founding of the republic [that] the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the

32

publication of current news of vital importance to the people of this country." *N.Y. Times*, 403 U.S. at 715 (Black J., concurring). Nearly fifty years later, the government has made another unprecedented incursion into protected speech by arguing that the First Amendment offers Plaintiffs *no protection whatsoever* against a regulation designed to shut down their preferred method of communication. Like the ban against publishing the Pentagon Papers, the WeChat ban is a prior restraint.

Nor does it matter that Plaintiffs might have some alternative forum to speak. In a long line of cases, the Supreme Court has struck down prior restraints "where public officials had forbidden the plaintiffs *the use of public places* to say what they wanted to say." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-533 (1975) (emphasis added) (holding prohibition on staging controversial play in municipal theatre unconstitutional). While prior restraints "took a variety of forms, [a]ll … had this in common: they gave public officials the power to deny use of a forum in advance of actual expression." *Id.*

The same logic led the Supreme Court to strike down a law forbidding residents "to display virtually any 'sign' on their property." *Ladue*, 512 U.S. at 54. In *Ladue*, the Court noted that the government "has almost completely foreclosed a venerable means of communication that is both unique and important." *Id.* at 55. The Court concluded that there is a "particular concern with laws that foreclose an

entire medium of expression"—even if residents could communicate using alternative means—and thus held that a "ban on almost all residential signs violates the First Amendment." *Id*. at 55, 58.

The First Amendment protections for the "venerable" medium of painted signage apply with equal force to digital platforms like WeChat. Any regulations that foreclose communications by "threatening penalties for future speech"—and IEEPA provides for criminal penalties—or rendering a medium of communication unusable constitutes a prior restraint. *See e.g.*, *Backpage.com*, 807 F.3d at 230 (holding operator was entitled to preliminary injunction based on government's campaign to starve an online forum for sex-related classified ads of its business); *Grosjean*, 297 U.S. at 244-45 (striking down tax enacted "with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers").

Here, the WeChat ban is a prior restraint that will "foreclose an entire medium of expression." *Ladue*, 512 U.S. at 55. As the district court correctly found, the WeChat ban would have "shut down" WeChat on the effective date of the President's Order. ER82. But even crediting the government's argument that the full effect of the WeChat ban would not be felt for one-to-two years, II-ER-404-405, Br. 18—or as long as it takes for the application to become impossible to use—that temporary stay of execution does not make the result any less pernicious.

34

Either immediately or in a short while, "the Secretary's prohibited transactions [would] effectively eliminate the plaintiffs' key platform for communications, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it." I-ER-82. A regulation that would indisputably eliminate WeChat in this country, thus making it impossible for Americans to communicate through a unique and highly-valued medium of communication, is the very definition of a prior restraint.

The government does not even attempt to argue that it can satisfy the virtually insurmountable standard required to overcome the constitutional presumption against the validity of a prior restraint. *See, e.g.*, *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) ("Even where questions of allegedly urgent national security … are concerned, we have imposed this 'most extraordinary remedy' only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures.") (citations omitted). Instead, it argues that the WeChat ban is "categorically … outside the prior-restraint framework" because "the prohibitions are content-neutral." Br. 35. Even assuming *arguendo* the WeChat ban is content neutral (and it is not, *see* Section I.B.2 *infra*), the Supreme Court has rejected this argument. *See, e.g.*, *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 764 (1988) (holding that content-

neutral law prohibiting the establishment of newspaper stands without a license was an unconstitutional prior restraint).[4]

Next, the government suggests that "the restrictions do not prohibit plaintiffs from engaging in the publication or broadcast of particular information or commentary at all," Br. 35, presumably because they contend that inferior communications platforms remain available and the WeChat application might limp along for one-to-two years. But the WeChat ban does not cease to be a prior restraint simply because other channels of communications might remain open. Simply put, "[o]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Southeastern Promotions*, 420 U.S. at 556 (holding that even if an alternate "forum had been available, that fact alone would not justify an otherwise impermissible prior restraint").

---

[4] The Government cites *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), for the proposition that content neutral regulations are "categorically … outside the prior-restraint framework." Br. 35. But the case says no such thing; the Court held that "a content-neutral permit scheme regulating speech in a [park]" is not a prior restraint because "[s]uch a traditional exercise of authority [did] not raise the censorship concerns that prompt[] us to impose the extraordinary procedural safeguards" applicable to prior restraints. *Thomas*, 534 U.S. at 322-23. This narrow holding about permitting regimes in public fora does not suggest that no content-neutral restriction can be a prior restraint. Indeed, a law banning *all* speech would clearly be a prior restraint even though it is expressly content-neutral.

More fundamentally, the purpose of the WeChat ban is to "shut down" a vibrant medium of communication; the fact that it might not accomplish this goal immediately, or explicitly ban specific communications, does not make it any less problematic. Indeed, the Supreme Court struck down a far-less-onerous law that regulated the terms under which Americans could receive mail from China because such a regime "is at war with the uninhibited, robust and wide open debate and discussion that are contemplated by the First Amendment." *Lamont*, 381 U.S. at 307. The WeChat ban is precisely the kind of prior restraint that we would rightly criticize the Chinese government for enacting. The fact that the Chinese government has "no equivalent guarantees [of free speech] only highlights the cherished values of our constitutional framework; it can never justify emulating the practice of restrictive regimes in the name of expediency." *Id*. at 310 (Brennan J., concurring).

### 2. The WeChat Ban Is A Content-Based Restriction On Speech And Fails Strict Scrutiny.

In addition to being a prior restraint, the WeChat ban is a content-based regulation of speech that is subject to—and fails—strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) ("[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]"). Although the government's primary position is that the WeChat ban is not subject to First Amendment review at all, it also argues that, if

the First Amendment applies, the "prohibitions are content neutral" and thus subject to intermediate scrutiny. Br. 32. This argument misinterprets the law and ignores the facts.

Courts apply strict scrutiny to laws that "disfavor certain subjects or viewpoints" while not restricting the speech of the population at large, on the ground that "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). The government's argument in favor of content-neutral status boils down to an assertion that "[t]he prohibitions at issue here … are in no way directed at *plaintiffs*, or the content of their speech." Br. 34. But the WeChat ban singles out a single communications application used predominantly by the Chinese community, and thus is precisely the type of law that is "taking the right to speak from some and giving it to others," thereby "[depriving] the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Citizens United,* 558 U.S. at 340-41. *See also Reed*, 576 U.S. at 169 ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."). The WeChat ban clearly disfavors the only medium of communication facilitating certain communications among the Chinese diaspora and reflects a

clear content preference against their communications—a bias amplified by the Executive's own statements expressing anti-Chinese animus. *See supra* p. 27.

And the government itself submitted evidence focusing on WeChat's use to disseminate "propaganda," facilitate "disinformation campaigns," and "promote pro-Chinese government content[.]"  II-ER-243-244; Br. 33, 39.  This explicit focus on the *content* of WeChat users' speech confirms that the ban is a content-based restriction subject to strict scrutiny.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (rules purportedly regulating time, place, and manner of speech actually content-based because they restrict people "from communicating a particular set of messages").

In order to survive strict scrutiny, the government must establish that the WeChat ban "is justified by a compelling government interest and is narrowly drawn to serve that interest."  *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 799 (2011).  This "is a demanding standard.  It is rare that a regulation restricting speech because of its content will ever be permissible."  *Id*. (citation and internal quotation marks omitted).  The government does not even attempt to argue that it could meet strict scrutiny—because it cannot do so.

The WeChat ban clearly fails strict scrutiny because it does not even address the problem that the government purports to identify—preventing the Chinese government from collecting U.S. user data.  On its face, the WeChat ban is

insufficient to stop that harm because, per the government, current users may *continue* to transmit data via the app, thus perpetuating "an unacceptable risk to national security by putting that sensitive data at the fingertips of the CCP." Br. 48. The district court also reached this obvious conclusion: "[W]hile the government has established that China's activities raise significant national-security concerns—it has put in scant little evidence that its effective ban of WeChat for all U.S. users addresses those concerns." I-ER-84. And even after the government submitted a second round of evidence—including classified documents—the district court still held that the "new evidence does not meaningfully alter its earlier submissions" and the "assessment of … the risks to national security—on this record—are unchanged." I-ER-16.

The government also falls far short of establishing that the WeChat ban is the "least restrictive" or least intrusive means of serving the government's interests. *Elrod*, 427 U.S. at 363. As the district court found, there are multiple alternative regulations that would have a far less burdensome effect on protected speech, while in fact addressing the asserted national-security concerns. Specifically, "[r]equiring industry best practices as part of a mitigation plan would allow the continued use of the platform, arguably addresses the government's significant national-security interests, and leaves open adequate channels for communication." I-ER-16. And the record reflects other "narrowly tailored

approaches that advance the government's national-security interest, such as barring WeChat from government devices (as Australia has done and as the Department of Homeland Security recommends) or adopting mitigation procedures like those in Tencent's mitigation proposal and Joe Hildebrand's best practices about data security." *Id*.

In sum, the WeChat ban is a content-based regulation on speech that cannot possibly meet the high standard required to survive.

### C. The District Court Did Not Abuse Its Discretion In Holding That The WeChat Ban Likely Would Not Survive Intermediate Scrutiny.

The district court held in the alternative that, based on the record before it, the government likely could not satisfy even intermediate scrutiny. I-ER-83-84, I-ER-16-17. That conclusion was not an abuse of discretion. The government had multiple opportunities to provide the district court with evidence to support its case, including an opportunity to supplement the record with classified materials, but the district court determined that "the government's prohibited transactions are not narrowly tailored to address the government's significant interest in national security." I-ER-16. On appeal, the government ignores the district court's well-reasoned factual findings and fails to identify a clear error sufficient to justify vacating the injunction.

First, the government faults the district court for concluding "merely that it believed there was 'scant little evidence' of national-security harms connected to WeChat's operation" and disregarding "the Secretary's careful consultation with other expert agencies including ODNI and DHS CISA." Br. 38. This argument misstates the district court's holding. Judge Beeler actually held that the government has "put in scant little evidence that its effective ban of WeChat for all U.S. users *addresses*" the government's "overarching national-security interest." I-ER-84 (emphasis added). This is clearly correct. Even assuming the Chinese government actually collects WeChat user data (which is contested), the WeChat ban does nothing to stop the Chinese government from harvesting information that has already been transmitted via the app or that will be transmitted in the future by current users.

Worse still, the government suggests that the district court "improperly disregard[ed]" evidence that was not yet in the record. Br. 37. The holding that there was "scant little evidence" on which to rule in the government's favor appeared in the initial decision granting Plaintiffs' motion for a preliminary injunction. The "disregarded" materials cited by the government were filed in connection with its subsequent motion to stay—and "[a]fter reviewing those materials … *the court did not alter its ultimate conclusion* but allowed that the evidence in fact 'illuminates the threat … to national security.'" Br. 37 n.4

42

(emphasis added); *see* I-ER-16. Because the district court considered all of the materials proffered by the government—and found them unavailing—the government has no grounds to complain that the court disregarded anything.

Having sidestepped the district court's factual findings, the government relies almost exclusively on the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), to argue that the district court should have rubber-stamped its determination that the purported risk to national security outweighs the First Amendment interest. Br. 36, 38. But the Supreme Court made clear in *Holder* that courts "do not defer to the Government's reading of the First Amendment, even when [national-security] interests are at stake," since "the Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Holder*, 561 U.S. at 35. Far from giving the government carte blanche to override First Amendment scrutiny every time it articulates a security concern, the Court emphasized that its decision was narrowly focused on the facts of the case—a prohibition on providing material aid to designated terrorist organizations. *Id.* at 39. The Court took pains to stress that its decision "in no way suggests that regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Id.*

The Ninth Circuit has also emphasized the importance of judicial review where national-security regulations intersect with the First Amendment. In a decision involving similar regulations to *Holder*, the Ninth Circuit specifically distinguished that case—determining that the specific "prohibitions on speech [at issue] violate the First Amendment" even though the government advanced essentially the same national-security interest as in *Holder. Al Haramian*, 686 F.3d at 1001.

The intermediate review standard requires the government regulation to "serve a 'legitimate' government interest" *and* "not burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 137 S.Ct. at 1740-41. Courts are not required to defer to governmental "speculation about danger," because "[o]therwise, the government's restriction of First Amendment expression in public areas would become essentially unreviewable." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990) (affirming injunction against regulation limiting distance that protestors could get to naval flotilla because "the district court was correct in holding that there was insufficient justification for the 75-yard free zone"). It is also the government's burden to demonstrate that "the regulation leaves open ample alternative channels of communication." *Id*. at 1227. In the digital context, this means that a regulation cannot achieve its purpose by imposing a "wide

sweep" that "precludes access to a large number of websites" that are unrelated to the interest being served. *Id*. at 1041 (law barring sex offenders "from accessing an enormous number of websites" did not satisfy intermediate scrutiny).

The government fails to identify reversible error in the district court's determination that "the prohibited transactions burden substantially more speech than is necessary to serve the government's significant interest in national security, especially given the lack of substitute channels for communication." Br. 18; *see* I-ER-17. The district court held that the "record reflects [alternative] narrowly tailored approaches that advance the government's significant national-security interest." I-ER-16. *See also* pp. 9-10 *supra* (listing alternatives). The government argues that the mitigation proposal and DHS CISA recommendation would not sufficiently address its national-security concerns. Br. 41-42. But again, this is a factual dispute on which there was conflicting evidence. *See, e.g.*, II-ER-427-429. The district court's determination was not clearly erroneous.

Finally, the government suggests that the WeChat ban can survive intermediate scrutiny because its "prohibitions leave open ample alternative channels of communication." Br. 43. But the district court found otherwise, based on the record before it. That determination was not clearly erroneous. *See* Section II.C, *infra*. Accordingly, the cases cited by the government for the proposition that the First Amendment protects against regulation that "forecloses an entire medium

45

of public expression across the landscape of a particular community or setting," Br. 44 (quoting *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1074 (9th Cir. 2006)), strongly support Plaintiffs' position.

\* \* \*

In sum, the WeChat ban will "shut down" a unique and critical medium of communication used by the Chinese diaspora, either immediately or after a short time. As such, the regulation is both a prior restraint and an unlawful content-based restriction on speech. And even if intermediate scrutiny applied, Judge Beeler correctly found that the government could not meet even that standard.

## II. The District Court Correctly Held That The Remaining Equitable Factors Tip Sharply In Plaintiffs' Favor.

Turning to the other preliminary-injunction factors, the government argues at length that the district court erred in discounting the national-security implications of enjoining the WeChat ban, overestimating the harms to plaintiffs, and balancing these equities. Br. 22-23, 36-39, 46-49. But it is the government that disregards the district court's actual findings and this Court's clear-error standard of review.

### A. The District Court's Assessment Of The Risks To National Security Does Not Constitute Clear Error.

The government repeatedly asserts that the district court inappropriately discounted the national-security risks that led to the WeChat ban. *E.g.*, Br. 48-49.

This fundamentally misapprehends the district court's analysis. The court *did* consider the government's asserted national-security interests at length, and acknowledged that concerns about China were "serious and significant." I-ER-39; *see also* I-ER-84. Indeed the court concluded that "general evidence about the threat to national security related to China … is considerable." I-ER-86. Where the district court parted ways from the government was in concluding that "the specific evidence about [any threat from] *WeChat* is modest." I-ER-86 (emphasis added). That latter factual determination is the relevant one here, and was not clearly erroneous.

There is no doubt that "preserving national security is 'an urgent objective of the highest order.'" *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2088 (2017) (quoting *Holder*, 561 U.S. at 28). But deference to the executive's claims of "national security" is not absolute; "national-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862 (2017); *id.* at 1861 ("There are limitations, of course, on the power of the Executive under Article II of the Constitution and in the powers authorized by congressional enactments, even with respect to matters of national security."); *Al Haramain*, 686 F.3d at 995-1001 (evaluating national-security rationale for banning activities of organization allegedly linked to terrorists).

47

Courts have repeatedly stressed that scrutiny of national-security claims is critical when core First Amendment rights are implicated. As Judge Gurfein famously explained in the Pentagon Papers case, "[t]he security of the Nation is not at the ramparts alone. Security also lies in the value of our free institutions." *United States* v. *N.Y. Times Co.*, 328 F. Supp. 324, 330-31 (S.D.N.Y.), *aff'd*, 403 U.S. 713 (1971). Thus, "[t]he Supreme Court has long declined to permit the unsupported invocation of 'national security' to cloud the First Amendment implications of prior restraints." *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 474 (5th Cir. 2016)). "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi* v. *Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality op.).

The seminal example is the Pentagon Papers case. The Supreme Court concluded that the government had not met its "heavy burden" of showing a national-security justification for the imposition of a prior restraint on the *New York Times* and *Washington Post*, even where it sought to prevent them from publishing leaked, classified information about U.S. operations in the Vietnam conflict. *N.Y. Times*, 403 U.S. at 714. As Justice Black stated in his concurrence, "[t]he word 'security' is a broad, vague generality whose contours should not be

48

invoked to abrogate the fundamental law embodied in the First Amendment." *Id*. at 719.

Similarly, the Supreme Court in *CBS, Inc. v. Davis*, 510 U.S. 1315 (1994), observed that even when national security is invoked, prior restraints are an "extraordinary remed[y]" that may be imposed "only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *Id*. at 1317. Indeed, only the most "exceptional" and immediate of national-security concerns allow a prior restraint on speech to remain in place. *Near*, 283 U.S. at 716; *cf. Haig v. Agee*, 453 U.S. 280, 306-08 (1981) (upholding revocation of passport on national-security grounds because of "campaign" to expose undercover CIA agents abroad, recruit collaborators, and divulge classified information).

No such exceptional circumstances exist in this case that would justify the extraordinary decision to single out and ban an entire platform of speech. As discussed below, the district court paid appropriate deference to the government's claim that China is "a persistent cyber espionage threat." I-ER-84; Br. 11. But after careful review, the court astutely concluded that the record contained "scant little evidence that its effective ban of WeChat for all U.S. users addresses those

concerns." I-ER-84.[5]  Indeed, the government was unable, after multiple tries, to identify any particular threat stemming *from WeChat*.

In its brief, the government advances an array of national-security arguments, hoping that something will stick.  In so doing, the government muddles what is actually in the record and what was before the district court at the time she granted the injunction.  We will thus address the evidence in a more-organized fashion.

> **1.    The Government's National-Security Evidence Opposing Plaintiffs' Preliminary Injunction Motion Was Not Specific To WeChat.**

The evidence of a national-security risk before the district court when she granted the preliminary injunction was largely hypothetical and not specific to WeChat and Tencent.  For instance, the government generally described "concerns" that Chinese telecommunications companies with suspected ties to the Chinese government "*could*" provide opportunities for espionage" or "*could*" allow China to exert pressure over critical infrastructure or gain access to sensitive information. I-ER-77 (emphasis added).  But the evidence it relied on focused on

---

[5] The district court's decision to grant the injunction was also consistent with the limits imposed on the President's IEEPA authority.  In blocking the TikTok ban, another court explained: "Congress has already performed a balancing act, and has determined that the President's ability to exercise his IEEPA authority to respond to a national emergency does not extend to actions that directly or indirectly regulate the importation or exportation of informational materials," which are protected under the First Amendment. *Marland*, 2020 WL 6381397, at *13 (citations omitted).

"critical infrastructure," and in particular on two specific Chinese companies that create physical components used in broadband networks, Huawei and ZTE. WeChat is a software app, however, and Tencent does not manufacture or operate telecommunications networks, equipment, or systems. *Id.* The government also cited "'potential'" risks generally associated with increasing reliance on mobile technologies, and pointed to government-contracting decisions prohibiting contractors from using telecommunications or video surveillance equipment or services produced by ZTE, Huawei, and "other identified Chinese entities." I-ER-73, 78. But again, neither Tencent nor WeChat was implicated by these reports or prohibitions.[6]

In fact, the only evidence of any threat from WeChat or Tencent specifically came from public information, published 16 months before the Executive Order was issued, by a foreign think tank, the Australian Strategic Policy Initiative. I-ER-78, II-ER-233, 236. That organization's most recent comprehensive analysis of WeChat, dated September 8, 2020, specifically recommends that risks from

---

[6] Indeed, although the Executive Order asserts that WeChat "automatically captures vast swaths of information from its users," II-ER-262, the government made no showing that user data was being improperly used. And rather than being clandestinely collected, WeChat users are fully informed of the app's data collection and use policies, which are consistent with those of Facebook, Google, and others. II-ER-429. *See also* WeChat Privacy Protection Summary, https://www.wechat.com/en/privacy_policy.html; *cf.* https://www.facebook.com/policy.php; https://policies.google.com/privacy?hl=en-US.

51

WeChat be addressed using broadly applicable data privacy and data protection frameworks, very much like those the government ultimately rejected here. I-SER-064.

Overall, the district court reasonably found that generalized evidence of a national-security threat from *China* was insufficient to justify banning WeChat given the lack of specific evidence and the First Amendment interests at stake. I-ER-86.

### 2. Subsequent Evidence Submitted By The Parties Was Properly Balanced By The District Court.

Seeking another bite at the apple, the government submitted additional information about national-security concerns with its stay motion. I-ER-2-8. As the district court held, the government's new evidence "does not meaningfully alter its earlier submissions" and the prohibited transactions are "not narrowly tailored to address the government's significant interest in national security." I-ER-16-17.

For starters, while the additional material "illuminate[d] the threat that Tencent (through WeChat) poses to national security," I-ER-16, it also highlighted the irreconcilable tension in the government's argument. On the one hand, the government claims that the threat from WeChat's collection of user data is so critical that the injunction must urgently be lifted; on the other, it asserts that the prohibited transactions would not prevent current users from continuing to use the app for at least the next one-to-two years. II-ER-244-445; II-ER-404-405; Br. 47-

48. During this lag time, WeChat user data would continue to be available for collection, II-ER-409, which is directly at odds with the government's claim that the injunction must be vacated to prevent WeChat from gathering data on U.S. users. Br. 48.

Beyond that, the government's memo mostly repackaged previously presented evidence (II-ER-232-257), but failed to show that WeChat poses a national-security threat of the kind that would pose an "irreparable harm" absent a stay. I-ER-16. It again refers to general concerns about Chinese surveillance of Americans, which it then couples with *speculation* about the ways in which Tencent *might* support such efforts—without any evidence or examples involving Americans' use of WeChat. II-ER-232-239. And the attached ODNI report, II-ER-249-250, is similarly slim on specifics as to WeChat. It generally discusses cyber-espionage and attacks by China, Russia, and Iran, but merely observes that WeChat collects a "broad suite of data," asserting that the "legitimate functionality within the WeChat ecosystem presents inherent vulnerabilities." II-ER-250.

Significantly, the memo also disclosed for the first time that Tencent had offered a Mitigation Proposal, and that the Commerce Department had also "considered additional mitigations." II-ER-244. Indeed, one of the primary attachments to the Decision Memo actually *recommends* a tailored remedy to address the "threat" posed by WeChat—not allowing its use by governmental and

critical-infrastructure workers—but *not* an outright ban. II-ER-251. These various mitigation proposals are precisely the kind of "obvious alternatives to a complete ban" that can avoid sweeping implications for free speech. I-ER-84.

As the district court noted, I-ER-16, plaintiffs' technical experts had separately suggested similar mitigation efforts to address any national-security concerns—describing industry best practices about data security, other mitigation measures, and narrowly-tailored bans for certain people. II-ER-424-429. Those experts also explained how the WeChat ban is "highly likely" to "serious[ly] degrad[e]" WeChat's services; would expose users to security vulnerabilities due to an inability to update already-installed software; and "do not limit the availability of WeChat's users' information to Tencent or [China]." II-ER-402, 404, 409-411, 428.

Overall, the record put forth by the government showed that its claims of "imminent harm" are entirely specious. It failed to offer up any examples in which WeChat was used to surveil Americans—let alone in a manner that poses a national-security threat—yet rejected any mitigation proposal absent a "complete divesture" of WeChat by Tencent. II-ER-244. The position taken by the government is inconsistent with the recommendations of its own agencies, as well as current industry standards. And its proposed solution would not, in its own telling, significantly address the alleged harm for one-to-two years.

### 3. The Government Is Improperly Attempting To Relitigate Its National-Security Claims Before This Court.

Much of the "threat" identified by the government in its opening brief is a rehashing of evidence presented to the district court, which as discussed above, generally concerns China and fails to show why WeChat specifically should be singled out as a threat. Br. 4-5, 9-18. The government also improperly tries to slip in novel information regarding "potential" data security threats posed by China (though yet again not specific to WeChat or Tencent). Br. 6-7. But the appropriate place to present that information was in the proceedings before the district court. *Lowry v. Barnhart*, 329 F.3d 1019, 1024–25 (9th Cir. 2003) ("'[It is a] basic tenet of appellate jurisprudence ... that parties may not unilaterally supplement the record on appeal with evidence not reviewed by the court below.'"). In any event, even the additional information provided by the government is largely off point, and insufficient to reverse the district court's considered judgment.

For instance, the government cites the Secretary of State's pronouncement that "untrusted applications" should be removed from U.S. mobile app stores in order to protect Americans' sensitive information from exploitation and theft by China. Br. 6. But a bar on downloads does nothing to address the risk to current WeChat users, who would not be required to remove it and who, according to the government, could continue to use the app (with their user data accessible to China) for years after the prohibitions go into effect. I-ER-14, II-ER-244-245.

55

The government also points to a presidential order reversing the Chinese acquisition of StayNTouch on national-security grounds.  Br. 7.  But even if there were any link between these two disparate examples—and the government does not show one—a hotel property-management application has significantly different First Amendment implications than the "digital town square" provided by WeChat to the Chinese-American community.

The government also points for the first time to the FCC's designation of certain Chinese companies attempting to operate telecommunications networks in the U.S. as national-security threats.  Br. 7.  But the threat posed by China's ability to infiltrate the levers and gears of critical infrastructure networks within the U.S.—which Americans would have no choice but to use—is very different from any threat posed by a mobile communications app's collection of data from individuals who choose to use that app.  Moreover, WeChat's collection of user data is a ubiquitous and largely accepted practice among tech companies, and disclosed to the WeChat Users.  *See* n.6, *supra.*  Indeed, "all Americans are under constant surveillance from big tech companies such as Facebook and Google," which "collect a vast amount of sensitive and private data" that is "routinely packaged and sold by so-called 'data brokers.'"  II-ER-429.  Thus, whether or not the prohibitions go into effect, China would be able to obtain the same type of data simply by buying it on the open market.  II-ER-429.

In addition to referring to new evidence, the government also refocuses its arguments about evidence that was before the district court—though again without changing the analysis significantly. The government now places additional emphasis on Chinese hacks and data breaches, for example. Br. 12. But it is unclear how the WeChat ban would prevent China from stealing Americans' data—including when WeChat users migrate to other platforms, as the government suggests they will. Br. 44. Moreover, although the government provides examples of Chinese nationals being charged with hacking offenses, none of the identified hacks involved using Chinese apps. Br. 12 (citing hacks on Anthem, Equifax, and the Office of Personnel Management). Again, there is evidence of the risk China poses to U.S. national security—but not that WeChat is a significant part of that risk.

Finally, the government elaborates Tencent's apparent ties to the Chinese government. Br. 5, 12-13. As with their omission of any discussion of the declarations of Plaintiffs' two technical experts, however, the government cherry-picks certain portions of the Decision Memo but ignores other portions that indicate that Tencent's connections with the CCP are no different than the majority of privately-owned companies in China. II-ER-237 (70% of private companies had Party Committees in 2017). Indeed, any organization with three or more CCP members—and there are almost 100 million—must organize a CCP committee,

which accounts for their prevalence in private enterprise. Constitution of the Communist Party of China Oct. 24, 2017, ch. V, art. 30.[7] CCP committees within large private companies like Tencent are even more prevalent—over 95 percent—though many conclude that they are of are of "marginal importance" to those companies' operations. Xiaojun Yan & Jie Huang, *Navigating Unknown Waters: The Chinese Communist Party's New Presence in the Private Sector*, 17(2) CHINA REV. at 38, 55 (2017).

\* \* \*

Overall, the fundamental error the government makes is taking the analytical leap from evidence that *China* poses national-security risks (both generally and specifically in the tech space), to its assertion that *WeChat* poses "immitigable" risks to our national security. II-ER-244. As the district court twice found, the claimed threat of WeChat simply does not live up to the government's hype.

### B. Plaintiffs Would Be Irreparably Harmed By A WeChat Ban.

The district court correctly held that Plaintiffs would suffer irreparable harm because "[t]he immediate threat is the elimination of their platform for communication," I-ER-86, and the loss of their First Amendment freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373.

---

[7] *See* https://bit.ly/39o3APE; https://bit.ly/3fyEtL8.

The harm is pervasive and severe: It would disrupt family relationships, II-ER-422, 478; religious observance, II-ER-478-479; and the delivery of mental health education and counseling. I-ER-71. Had the ban been allowed to take effect during the recent election season, it would have shut the door on one of the few spaces where Chinese-Americans communicate about U.S. politics.[8] II-ER-476; I-SER-045, 48-49 (describing WeChat as a "critical" news source, and a "major political platform for debating political issues and advocating for specific agendas during the current and previous presidential election campaigns."). The resulting loss of the opportunity to freely discuss political views and read relevant commentary prior to an election would be irreparable. *See Elrod*, 427 U.S. at 374 n.29 ("The timeliness of political speech is particularly important."). This remains a real concern now—in Georgia, for example—and in future elections.

The ban would likewise effectively preclude Plaintiffs and others from using the app as a business tool. II-ER-421-422, 476. And as discussed below, every alternative is woefully inferior to WeChat, either in terms of usage among Chinese-Americans or based on the app's functionality. *See, e.g.*, II-ER-416-418, 421. Even if a business could find a suitable alternative, customers may not follow the

---

[8] Indeed, WeChat was recognized as a key tool for getting out the vote in Chinese communities during the recent election. *See* Noah Kim, *How Andrew Yang Quieted the Asian American Right*, THE ATLANTIC (Feb. 3, 2020), https://bit.ly/2J1fh4p.

business to the new platform, resulting in a permanent loss of business. II-ER-422; *cf*. *TikTok Inc.*, 2020 WL 5763634, at *8 ("The nature of social media is also such that users are unlikely to return to platforms that they have abandoned."). In addition, banning WeChat would eliminate a platform that has been a lifeline for Chinese restaurants' survival during the pandemic. *See, e.g.*, Danny Lewis, *How Banning WeChat Could Harm New York City's Chinese Restaurants*, WNYC NEWS (Oct. 28, 2020), https://www.wnyc.org/story/how-banning-wechat-could-harm-new-york-citys-chinese-restaurants/.

The WeChat ban would also irreparably harm Plaintiffs by chilling their access to critical Chinese-language information and communications that might be available only through WeChat. *See* II-ER-475, I-SER-024 (four out of ten Chinese in the U.S. require WeChat to communicate because of their limited English proficiencies); Francesco Liang, *Pope Francis's Mass from the Casa Santa Marta followed even in China*, VATICAN NEWS (May 20, 2020), https://bit.ly/2TiIJEv ("A simultaneous translation [was] disseminated through *WeChat*."). During the pandemic, WeChat has also been critical for disseminating information regarding testing, prevention, and government responses. II-ER-451-452.

Finally, Plaintiffs would be irreparably harmed even by just the first prohibition because the lack of updates would expose them to significant security

risks.  II-ER-399, 408-409, 428.  The preclusion on others downloading the app would also preclude them from expanding their networks.  II-SER-044.

### C.    There Are No Viable Alternatives To WeChat.

The government's primary argument against irreparable injury is that use of WeChat is merely a "*preference*," Br. 44, and that there are alternative applications available for WeChat users.  *Id.*  The government fundamentally misunderstands the nature and functionality of WeChat.  The district court's factual findings as to this point—that there are "no viable substitute platforms or apps for the Chinese-speaking and Chinese-American community," I-ER-83—is subject only to clear-error review.  But there was no error: Judge Beeler correctly concluded that "WeChat is effectively the only means of communication for many in the community, not only because China bans other apps, but also because Chinese speakers with limited English proficiency have no options other than WeChat." *Id.*

WeChat's uniqueness is apparent from the omnipresence of the app within the Chinese diaspora.  A large proportion of the Chinese-American community has limited English proficiency, and these users depend on WeChat because it is designed for Chinese speakers.  II-ER-480, 483, 489-490, 502, 507-508; I-SER-024, 42-50.  Other apps pushed by the government as alternatives to WeChat, Br. 43-44, do not offer the same Chinese-language features or functionality as WeChat.  Plaintiff Cao explained, for instance, that Telegram's sign-up materials

61

and privacy policy are only in English, and "[t]he app has about a dozen language choices, but does not include Chinese." II-ER-416. Similarly, "Line's interface is designed for English speakers"; "does not have in-app translation and voice-to-text functions like WeChat"; and "does not have a privacy policy in Chinese." II-ER-416-417. Other platforms are similarly deficient in terms of language capabilities, (*id.*), or lack the same social-media, blogging, and group communication functionalities as WeChat. II-ER-421-422, 486, 493, 499-500.

The government also *acknowledges* that many of the alternative apps they suggest are banned in China. Br. 44; *see* I-ER-70. The claim that those platforms are viable substitutes for WeChat, which is widely used by U.S. users to communicate with friends, family, and others in China, I-ER-70, is simply absurd.

Finally, the government's assertion that physical mail, email, or telephone calls are adequate alternatives to WeChat, Br. 43, willfully ignores that WeChat is far more than a means of one-to-one communication. *See, e.g.*, I-ER-70, II-ER-421-422, 476, 486, 493, 499-500; I-SER-045, 48-49. "In short, WeChat is irreplaceable for its users in the U.S" because the alternatives suggested by the government simply "lack the cultural relevance and practical interface with China and do not provide the integral connection that WeChat provides to the Chinese community." I-ER-70-71; *see also* II-ER-416-418; II-ER-495-96 (describing the "'stickiness' of WeChat and its irreplaceability"); II-ER-482-483 (stating WeChat

is "deeply integrated into users' daily lives" and "integrates with essential public services").

## CONCLUSION

Because the district court did not abuse its discretion in granting a preliminary injunction against the WeChat ban, the decision below should be affirmed.

Dated: November 27, 2020

Respectfully submitted,

*/s/ David M. Gossett*

MICHAEL W. BIEN
ERNEST GALVAN
VAN SWEARINGEN
BENJAMIN BIEN-KAHN
ALEXANDER GOURSE
AMY XU
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

KELIANG (CLAY) ZHU
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, CA 94588

ANGUS F. NI
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, WA 98104

DAVID M. GOSSETT
COURTNEY T. DETHOMAS
DAVIS WRIGHT TREMAINE LLP
1301 K Street, N.W., Suite 500 East
Washington, DC 20005
(202) 973-4200

THOMAS R. BURKE
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
(415) 276-6500

JOHN M. BROWNING
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, NY 11201
(212) 489-8230

*Counsel for Plaintiffs–Appellees*
U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs–Appellees state that they know of no related case pending in this Court.

 */s/ David M. Gossett*
David M. Gossett

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-16908

I am the attorney or self-represented party.

**This brief contains** | 13,995 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/David Gossett | **Date** | 11/27/2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                        *Rev. 12/01/2018*